1  C. Mark Whitehead, III (Bar No. 27682)
   The Whitehead Law Firm, L.L.C.
2  Post Office Box 81007
   Lafayette, LA 70598
3  337 740-6006 Telephone
4  337 740-6002  Facsimile

5  Attorney for Plaintiffs

6

7                      E-filing

8              UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                 (SAN FRANCISCO DIVISION)

11                                        1822

12  JAMES and ALICE HUFFMAN, ET AL      Case No. _____

13            Plaintiffs,               **CIVIL COMPLAINT**

14  v.

15  PFIZER INC., PHARMACIA              **JURY TRIAL DEMANDED**
    CORPORATION, and G.D. SEARLE, LLC,
16
            Defendants.
17

18
19      JAMES AND ALICE HUFFMAN (hereinafter referred to as "Plaintiff Huffman") and

20  Jan V. Yonnone individually, as personal representative of and on behalf of Carmine Yonnone

21  (hereinafter referred to as "Plaintiff Yonnone"); through counsel, bring this action against

22  Defendants PFIZER INC., PHARMACIA CORPORATION, and G.D. SEARLE, LLC (hereafter

23  collectively "Defendants") and alleges as follows:

24

25  **I.    PARTIES**
            1.    This is an action for damages arising from Defendants' design, manufacture,
26
    sale, testing, marketing, advertising, promotion, and/or distribution of the unsafe medication
27
    Valdecoxib, trade name Bextra®.
28'

1    2.    Plaintiff HUFFMAN is an individual who is a citizen of the state of

2    Michigan, and a resident of Antrim County, Michigan.

3    3.    Plaintiff YONNONE is an individual who is a citizen of the state of New

4    York, and a resident of Orange County, New York.

5

6    4.    Defendant Pfizer Inc. ("Pfizer") is a Delaware corporation with its principal

7    place of business in New York, New York.  In 2003, Pfizer acquired Pharmacia Corporation for

8    nearly $60 billion.  At all relevant times Pfizer and/or its predecessors in interest were engaged in

9    the business of designing, testing, manufacturing, packaging, marketing, distributing, promoting,

10   and selling the drug Valdecoxib, under the trade name BEXTRA® in California, Mississippi,

11   Illinois and nationwide.

12   5.    Defendant G. D. Searle, LLC, formerly known as G. D. Searle & Co.

13   ("Searle") is a Delaware corporation with its principal place of business in Illinois.  At all relevant

14   times, Searle has been engaged in the business of marketing and selling BEXTRA® nationwide

15   and in California, Michigan and New York.  Searle is a subsidiary of Pfizer, acting as its agent and

16   alter ego in all matters alleged within this Complaint.

17   6.    Defendant Pharmacia Corporation ("Pharmacia ") is a Delaware corporation

18   with its principal place of business in New Jersey.  At all relevant times, Pharmacia, and its

19   predecessors in interest have been engaged in the business of designing, testing, manufacturing,

20   packaging, marketing, distributing, promoting, and selling BEXTRA® nationwide and in

21   California, Michigan and Illinois.

22   **II.    JURISDICTION AND VENUE**

23   7.    This is an action for damages, which exceeds seventy-five thousand dollars

24   ($75,000.00).

25   8.    There is complete diversity of citizenship between the Plaintiffs and

26   Defendants.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.A. §

27   1332 (diversity jurisdiction) because the amount in controversy exceeds $75,000.00, and because

28   there is complete diversity of citizenship between Plaintiffs and Defendants.

-2-

1           9.       Venue is proper in this United States Judicial District pursuant to 28

2 U.S.C.A. § 1391. Defendants marketed, advertised and distributed the dangerous product in the

3 district, thereby receiving substantial financial benefit and profits the dangerous product in this

4 district, and reside in this district under 28 U.S.C.A. § 1391(c), such that venue is proper.

5           10.      At all relevant times herein, Defendants were in the business of designing,

6 manufacturing, marketing, developing, testing, labeling, promoting, distributing, warranting and

7 selling their product, BEXTRA®. Defendants at all times relevant hereto designed, developed,

8 manufactured, promoted, marketed, distributed, tested, warranted and sold in interstate commerce

9 (including California and Michigan) the aforementioned prescription drug. Defendants do

10 substantial business in the State of California and within this Federal Judicial District, advertise in

11 this district, receive substantial compensation and profits from sales of BEXTRA® in this District,

12 and made material omissions and misrepresentations and breaches of warranties in this District so

13 as to subject them to *in personam* jurisdiction in this District. In engaging in the conduct alleged

14 herein each defendant acted as the agent for each of the other defendants, or those defendant's

15 predecessors in interest.

16 **III.    INTERDISTRICT ASSIGNMENT**

17           11.      Assignment to the San Francisco Division is proper as this action is related

18 to *In Re: Bextra® and Celebrex Marketing Sales Prac. and Pro. Liab. Lit.*, MDL-1699, assigned to

19 the Honorable Charles R. Breyer by the Judicial Panel on Multidistrict Litigation on September 6,

20 2005.

21 **IV.    FACTUAL BACKGROUND**

22      **A.    Facts Regarding Plaintiff's**

23

24           12.      Plaintiff HUFFMAN ingested BEXTRA® as prescribed from approximately

25 March of 2004 until approximately September of 2004. As a result of taking BEXTRA®, Plaintiff

26 suffered a Cerebral Vascular Accident on September 1, 2004.

27

28

1    13.    Plaintiff YONNONE ingested BEXTRA® as prescribed from approximately
2  September 14, 2004 until October 26, 2004.  As a result of taking BEXTRA®, Plaintiff suffered a
3  Myocardial Infarction on October 26, 2003.

4    14.    Plaintiffs HUFFMAN and YONNONE's healthcare providers could not
5  have reasonably known or have learned through reasonable diligence that such injury directly
6  resulted  from  Defendants'  negligent  and  otherwise  culpable  acts,  omissions,  and
7  misrepresentations or from Plaintiffs ingestion of BEXTRA®.

8    15.    Plaintiffs HUFFMAN AND YONNONE used BEXTRA® in a proper and
9  reasonably foreseeable manner and used it in a condition that was substantially the same as the
10  condition in which it was manufactured and sold.

11    16.    Plaintiffs HUFFMAN AND YONNONE would not have used BEXTRA®
12  had Defendants properly disclosed the risks associated with the drug.

13    **B.**    **Facts Regarding Bextra® and Bextra's Market Launch**

14    17.    Bextra® is one of a class of pain medications called non-steroidal anti-
15  inflammatory drugs ("NSAIDs").  Aspirin, naproxen (trade name Aleve), and ibuprofen (trade
16  name Advil) are examples of well-known NSAIDs.

17    18.    NSAIDs reduce pain by blocking the body's production of pain transmission
18  enzymes called cycloxygenase or "COX."  There are two forms of COX enzymes—COX-1 and
19  COX-2. Aspirin, naproxen and ibuprofen all act by blocking COX-1 and COX-2 enzymes.

20    19.    In addition to decreasing inflammation, the prostaglandins that are supported
21  by COX-1 enzymes are involved in the production of gastric mucus; this protects the stomach wall
22  from the hydrochloric acid present in the stomach.  It is generally accepted in the medical
23  community that by blocking the COX-1 enzyme, the body's ability to protect gastric tissue is
24  hampered and as a result, can cause harmful gastrointestinal side effects, including stomach
25  ulceration and bleeding.

26    20.    Prostaglandin I2 is the predominant cyclooxygenase product in endothelium,
27  inhibiting platelet aggregation (preventing clot formation), causing vasodilation, and preventing
28  the proliferation of vascular smooth muscle.  Whereas older NSAIDS inhibit Thromboxane A2 and

- 4 -

1 Prostaglandin I2, the COX-2 inhibitors leave Thromboxane A2 unaffected. Thromboxane A2 is a
2 potent platelet aggregator and vasoconstrictor, which is synthesized by platelets. Therefore, while
3 the older NSAIDS suppress platelet aggregation and vasoconstriction, the COX-2 inhibitors
4 support it.

5          21.    Traditional NSAIDs like aspirin reduce pain/inflammation and therefore
6 pain by inhibiting both COX-1 and COX-2 enzymes simultaneously. As would be expected,
7 traditional NSAIDs may cause ulcers in the stomach. However, traditional NSAIDs do not cause
8 blood clots, rather they actually reduce the risk of clots and help protect heart function.

9          22.    Defendants and other pharmaceutical companies set out to remedy these
10 ulcer and bleeding problems suffered by some NSAID users by developing "selective" inhibitors
11 that would block only COX-2 production, thus (supposedly) allowing the proper maintenance of
12 gastric tissue while still reducing inflammation.

13          23.    In making this decision, Defendants and their predecessors in interest either
14 intentionally ignored or recklessly disregarded current medical knowledge that selective COX-2
15 inhibition lowers prostacyclin levels and causes thromboxane $A_2$ to be uninhibited, causing blood
16 clots, and giving rise to various clot-related cardiovascular events, including heart attack, stroke,
17 unstable angina. The vasoconstriction and fluid retention cause the hypertension.

18          24.    Pfizer launched Celebrex, the first of the three major COX-2 inhibitor drugs,
19 in early 1999 and initiated a massive marketing campaign to convince doctors and consumers of
20 the superiority of their new "blockbuster" drug over less inexpensive NSAIDs. In May 1999,
21 Merck & Co., Inc. ("Merck") launched Vioxx, its own selective COX-2 inhibitor.

22          25.    Seeking increased market share in this extremely lucrative market,
23 Defendants, and their predecessors in interest, also sought approval of a "second generation"
24 selective COX-2 inhibitor and filed for FDA approval of Bextra® on January 16, 2001 for the
25 (i) prevention and treatment of acute pain, (ii) treatment of primary dysmenorrhea, and (iii) relief
26 of the signs and symptoms of osteoarthritis and adult rheumatoid arthritis.

27
28

- 5 -

1             26.     The FDA granted approval of the new drug on November 16, 2001, for two

2    particular uses: (i) treatment of primary dysmenorrhea and (ii) relief for the signs and symptoms

3    of osteoarthritis and rheumatoid arthritis.

4             27.     The FDA did not grant approval to market and promote Bextra® for the

5    management or prevention of acute pain.

6             28.     The FDA did not grant approval to promote Bextra® as more effective than

7    other NSAIDs in preventing clinically serious gastrointestinal events such as perforations, ulcers or

8    gastric bleeding.

9             29.     Even without a label that allowed Defendants to legitimately claim superior

10   safety, when Defendants, and their predecessors-in-interest, began marketing Bextra® in early

11   2002, Defendants and their representatives and agents misrepresented the safety profile of Bextra®

12   to consumers, including Plaintiff, the medical community, healthcare providers, and third party

13   payers. Defendants proceeded to promote, market, sell, and distribute Bextra® as a much safer

14   and more effective pain reliever than other NSAIDs, such as aspirin, naproxen, and ibuprofen.

15       **C.**    **Facts Regarding Bextra®'s Safety and Defendants' Knowledge Thereof.**

16            30.     The potential for cardiovascular risk of selective COX-2 inhibitors was

17   known to Defendants long before the FDA granted market approval in November 2, 2001. By

18   1997, and prior to the submission of the New Drug Application (the "NDA") for Bextra®,

19   Defendants was aware that, by inhibiting COX-2, Bextra® altered the homeostatic balance

20   between prostacylcin synthesis and thromboxane and thereby, increased the prothrombotic effects

21   of the drugs, causing blood clots to form in those who ingested it. *See* Topol, E.J., *et al.*, *Risk of*

22   *Cardiovascular Events Associated with Selective Cox-2 Inhibitors*, *JAMA*, August 22, 2001 at 954.

23   Although all COX-2 inhibitors have this mechanism of action, Bextra® was the most selective

24   COX-2 inhibitor proposed for approval. Accordingly, it had the greatest potential to cause adverse

25   cardiovascular and cerebrovascular events.

26            31.     As Pharmacologist, Dr. Garrett Fitzgerald, of the University of

27   Pennsylvania, reported in an editorial published in *The New England Journal of Medicine* on

28   October 21, 2004, that it was known as early as 1999 that selective COX-2 inhibitors, such as

- 6 -

1  Bextra®, suppressed the formation of prostaglandin I-2 in healthy volunteers, inhibited platelet
2  aggregation in vitro, and may predispose patients to myocardial infarction or thrombotic stroke.

3          32.    Nevertheless, on January 16, 2001, Defendants submitted an NDA to the
4  FDA for Bextra®, omitting information about the extent of the risks associated with Bextra®.
5  Without a complete picture of the potential hazards associated with the drug, the FDA approved
6  Bextra® on or about November 16, 2001.

7          33.    Based on the studies performed on Celebrex, Vioxx, Bextra®, and other
8  COX-2 inhibitors, and basic research on this type of selective inhibitor which had been widely
9  conducted, Defendants knew when Bextra® was being developed and tested that selective COX-2
10 inhibitors posed serious cardiovascular risks for anyone who took them, and presented a specific
11 additional threat to anyone with existing heart disease or cardiovascular risk factors. Studies show
12 that selective COX-2 inhibitors, including Bextra®, decrease blood levels of a prostacyclin. When
13 those levels fall, the arteries are more vulnerable to clotting, high blood pressure, heart attack, and
14 stroke.

15         34.    On December 9, 2004, the FDA issued new information on side effects
16 associated with the use of Bextra® and required the addition of certain warnings to, and the
17 strengthening of other warnings on, the Bextra® label.  The enhanced warnings followed in the
18 wake of the results of additional cardiovascular studies performed by Defendants, as well as
19 numerous complaints to the FDA regarding severe skin reactions.

20         35.    Yet well prior to this warning, Defendants had knowledge of the coronary
21 and cardiovascular safety risks of Bextra® from several studies. *See e.g.*, Otto, E.O., *Efficacy and*
22 *Safety of the Cyclooxygenase 2 Inhibitors Parecoxib and Valdecoxib in Patients Undergoing*
23 *Coronary Artery Bypass Surgery*, *The Journal of Thoracic and Cardiovascular Surgery*, June 2003
24 at 1481.

25         36.    Even Defendants' own (and Pfizer funded) post- drug approval meta-
26 analysis study (first presented on March 31, 2003 and again on May 15, 2003) included this data
27 showing an increased cardiovascular risk in patients treated with Bextra® after undergoing
28 coronary artery bypass graft surgery.  Observed events included heart attack, stroke, and blood

- 7 -

1   clots in the legs and lungs. The results were particularly relevant and striking as each of the study

2   participants who were a post-bypass surgery patient was taking anti-clotting agents at the time their

3   exposure to Bextra® was being tracked.

4          37.    In mid-January 2005, a peer-reviewed paper from the University of

5   Pennsylvania found that in patients having heart bypass surgery, those who took Bextra® in the

6   intravenous form, parecoxib, as opposed to a placebo, were three times more likely to have a heart

7   attack or stroke.

8          38.    From February 16-18, 2005, the FDA's Drug Safety and Risk Management

9   Advisory Committee and the Arthritis Drug Advisory Committee met jointly to further examine

10  the safety of COX-2 inhibitors. There, FDA Office of Drug Safety Officer David Graham testified

11  that selective COX-2 inhibitors increase the risk for adverse cardiovascular events at about the

12  same rate as cigarette smoking, hypertension, and diabetes.

13         39.    Despite years of studies on selective COX-2 inhibitors, as well as the

14  disturbing new studies specifically analyzing the risks of Bextra®, Defendants failed to take any

15  action to protect the health and welfare of patients, but instead, continued to promote the drug for

16  sale even after the FDA's Drug Safety and Risk Management Advisory Committee and Arthritis

17  Drug Advisory Committee meetings.

18         40.    On April 7, 2005, the FDA finally insisted that Defendants "voluntarily

19  withdraw" Bextra® from the U.S. market, stating:

20              ". . . the Agency has concluded that the overall risk versus benefit
                profile of Bextra® is unfavorable. This conclusion is based on the
21              potential increased risk for serious cardiovascular (CV) adverse
                events, which appears to be a class effect of non-steroidal anti-
22              inflammatory drugs (NSAIDs) (excluding aspirin), an increased
                risk of serious skin reactions (e.g. toxic epidermal necrolysis,
23              Stevens-Johnson syndrome, erythema multiforme) compared to
                other NSAIDs, and the fact that Bextra® has not been shown to
24              offer any unique advantage over the other available NSAIDs."

25         41.    FDA Alert for Healthcare Professionals, April 7, 2005.

26  Continuing, the FDA noted:

27              "Bextra® has been demonstrated to be associated with an
                increased risk of serious adverse CV events in two short-term trials
28              in patients immediately post-operative from coronary artery bypass

                                          - 8 -

graft (CABG) surgery . . . . FDA has concluded that it is reasonable to extrapolate the adverse CV risk information for Bextra® from the short-term CABG trials to chronic use given the fact that other COX-2 selective NSAIDs have been shown in long-term controlled clinical trials to be associated with an increased risk of serious adverse CV events (e.g., death, MI, stroke), and the well described risk of serious, and often life-threatening gastrointestinal bleeding . . . . To date, there have been no studies that demonstrate an advantage of Bextra® over other NSAIDs that might offset the concern about the[] serous skin risks, such as studies that show a GI safety benefit, better efficacy compared to other products, or efficacy in a setting of patients who are refractory to treatment with other products."

42.    The scientific data available during and after Bextra®'s approval process made clear to Defendants that their formulation of Bextra® would cause a higher risk of blood clots, stroke and/or myocardial infarctions among Bextra® consumers, alerting them to the need to do additional and adequate safety studies.

43.    As stated by Dr. Topol on October 21, 2004, in *The New England Journal of Medicine*, outlining Defendants' failure to have conducted the necessary trials before marketing to humans " . . . it is mandatory to conduct a trial specifically assessing cardiovascular risk and benefit of (COX-2 inhibitors). Such a trial needed to be conducted in patients with established coronary artery disease, who frequently have coexisting osteoarthritis requiring medication and have the highest risk of further cardiovascular events."

44.    Dr. Topol was also the author on the study published in August 2001 in JAMA (listed above) that reported an increased risk of thrombotic cardiovascular events in persons who used COX-2 inhibitors.

45.    Based upon readily available scientific data, Defendants knew, or should have known, that their pre-approval testing of Bextra® did not adequately represent the cross-section of individuals who were intended consumers and therefore, likely to take Bextra®. Therefore, Defendants' testing and studies were grossly inadequate. *See, e.g.*, PDR entry for Bextra® (noting that: "**Platelets**: In four clinical studies with young and elderly (>/=65 years) subjects, single and multiple doses up to 7 day mg BID had no effect on platelet aggregation").

46.    Had Defendants done adequate testing prior to approval and "market launch," rather than the extremely short duration studies done on the small size patient base that

1  was actually done) Pharmacia and Searle's scientific data would have revealed significant
2  increases in incidence of strokes and myocardial infarctions among the intended and targeted
3  population of Bextra® consumers.  Adequate testing would have shown that Bextra® possessed
4  serious side effects for individuals such as Plaintiffs.  Defendants should have taken appropriate
5  measures to ensure that their defectively designed product would not be placed in the stream of
6  commerce and/or should have provided full and proper warnings accurately and fully reflecting the
7  scope and severity of symptoms of those side effects should have been made.

8        47.    In fact, post-market approval data did reveal increased risks of clotting,
9  stroke and myocardial infarction, but this information was intentionally suppressed by Defendants
10 in order for them to gain significant profits from continued Bextra® sales.

11       48.    Defendants' failure to conduct adequate testing and/or additional testing
12 prior to "market launch" was based upon their desire to generate maximum financial gains for
13 themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2
14 inhibitor market.

15       49.    At the time Defendants manufactured, advertised, and distributed Bextra®
16 to consumers, Defendants intentionally or recklessly ignored and/or withheld information
17 regarding the increased risks of hypertension, stroke and/or myocardial infarctions because
18 Defendants knew that if such increased risks were disclosed, consumers such as Plaintiffs would
19 not purchase Bextra®, but instead would purchase other cheaper and safer NSAIDs.

20     **D.    Facts Regarding Defendants' Marketing and Sale of Bextra®**

21       50.    Plaintiffs and at all times relevant herein, Defendants engaged in a
22 marketing campaign with the intent that consumers would perceive Bextra® as a safer and better
23 drug than its other NSAIDs and, therefore, purchase Bextra®.

24       51.    Defendants widely and successfully marketed Bextra® throughout the
25 United States by, among other things, conducting promotional campaigns that misrepresented the
26 efficacy of Bextra® in order to induce a widespread use and consumption.  Bextra® was
27 represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems.
28

- 10 -

1  Defendants made misrepresentations by means of media advertisements, and statements contained
2  in sales literature provided to Plaintiff's prescribing physicians.

3          52.    Despite knowledge of the dangers presented by Bextra®, Defendants and
4  Defendants' predecessors in interest, through their officers, directors and managing agents for the
5  purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy
6  the known defects of Defendants' product, Bextra®, and failed to warn the public, including
7  Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
8  Bextra®®. Defendants and their officers, agents and managers intentionally proceeded with the
9  inadequate safety testing, and then the manufacturing, sale and marketing of Defendants' product,
10 Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance
11 their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
12 conscious disregard for the safety of the public and particularly of Plaintiffs.

13         53.    In an elaborate and sophisticated manner, Defendants aggressively marketed
14 Bextra® directly to consumers and medical professionals (including physicians and leading
15 medical scholars) in order to leverage pressure on third party payers, medical care organizations,
16 and large institutional buyers (*e.g.*, hospitals) to include Bextra® on their formularies. Faced with
17 the increased demand for the drug by consumers and health care professionals that resulted from
18 Defendants' successful advertising and marketing blitz, third party payers were compelled to add
19 Bextra® to their formularies. Defendants' marketing campaign specifically targeted third party
20 payers, physicians, and consumers, and was designed to convince them of both the therapeutic and
21 economic value of Bextra®.

22         54.    Defendants represented that Bextra® was similar to ibuprofen and naproxen
23 but was superior because it lacked any of the common gastrointestinal adverse side effects
24 associated with these and other non-steroidal anti-inflammatory drugs ("NSAIDS"). For instance,
25 NSAIDS can, in certain patients, cause gastrointestinal perforations, ulcers and bleeding with long-
26 term use. Defendants promoted Bextra® as a safe and effective alternative that would not have the
27 same deleterious and painful impact on the gut, but that would be just as effective, if not more so,
28 for pain relief.

1      55.    Bextra® possessed dangerous and concealed or undisclosed side effects,
2 including the increased risk of serious cardiovascular events, such as heart attacks, unstable angina,
3 cardiac clotting, deep vein thrombosis, hypertension, and cerebrovascular events, such as strokes.
4 In addition, Bextra® was no more effective than traditional and less expensive NSAIDs and, just
5 like traditional NSAIDs, carried a risk of perforations, ulcers, and gastrointestinal bleeding.
6 Defendants chose not to warn about these risks and dangers.

7      56.    Defendants knew of these risks before the U.S. Food and Drug
8 Administration (the "FDA") approved Bextra® for sale on November 16, 2001, but Defendants
9 ignored, downplayed, suppressed, omitted, and concealed these serious safety risks and denied
10 inefficacy in its promotion, advertising, marketing, and sale of Bextra®.  Defendants' omission,
11 suppression, and concealment of this important information enabled Bextra® to be sold to, and
12 purchased, or paid for by, the Consumers at a grossly inflated price.

13      57.    Consequently, Bextra® captured a large market share of anti-inflammatory
14 drugs prescribed for and used by patients.  In 2002 alone (after a drug launch in March of 2002),
15 sales of Bextra® exceeded $1.5 billion, despite the significantly higher cost of Bextra® as
16 compared to other pain relievers in the same family of drugs.

17      58.    It was not until April 7, 2005, that Defendants finally acknowledged
18 Bextra®'s deleterious side effects and announced that they were withdrawing the drug from the
19 worldwide market based on what it misleadingly termed "new" and "unexpected" evidence linking
20 Bextra® to an increased risk of heart attacks and strokes.

21      59.    Had Defendants done adequate testing prior to approval and "market
22 launch," Pharmacia's scientific data would have revealed significant increases in stroke and
23 myocardial infarction amongst the intended population of Bextra® consumers.  Adequate testing
24 would have shown that Bextra® possessed serious side effects.  Defendants should have taken
25 appropriate measures to ensure that their defectively designed product would not be placed in the
26 stream of commerce and/or should have provided full and proper warnings accurately and fully
27 reflecting the scope and severity of symptoms of those side effects should have been made.

28

60. In fact, post-market approval data did reveal increased risks of clotting, stroke and myocardial infarction, but this information was intentionally suppressed by Defendants in order for them to gain significant profits from continued Bextra® sales.

61. Defendants' failure to conduct adequate testing and/or additional testing prior to "market launch" was based upon their desire to generate maximum financial gains for themselves and to gain a significant market share in the lucrative multi-billion dollar COX-2 inhibitor market.

62. At the time Defendants manufactured, advertising, and distributed Bextra® to consumers, Defendants intentionally or recklessly ignored and/or withheld information regarding the increased risks of hypertension, stroke and/or myocardial infarctions because Defendants knew that if such increased risks were disclosed, consumers such as plaintiff would not purchase Bextra®, but instead would purchase other cheaper and safer NSAID drugs.

63. At all times relevant herein, Defendants engaged in a marketing campaign with the intent that consumers, including plaintiff, and their doctors would perceive Bextra® as a better drug than its competitors and, therefore, purchase Bextra®.

64. Defendants widely and successfully marketed Bextra® throughout the United States by, among other things, conducting promotional campaigns that misrepresented the efficacy of Bextra® in order to induce a widespread use and consumption. Bextra® was represented to aid the pain and discomfort of arthritis, osteoarthritis, and related problems. Defendants made misrepresentations by means of media advertisements, and statements contained in sales literature provided to Plaintiffs prescribing physicians.

65. Prior to manufacturing, sale and distribution of Bextra®, Defendants, through their officers, director and managing agents, had notice and knowledge from several sources, that Bextra® presented substantial and unreasonable risks of harm to the consumer. As such, Bextra® consumers, including Plaintiffs, were unreasonably subject to risk of injury or death from the consumption of Defendants' product, Bextra®. Despite such knowledge, Defendants and Defendants' predecessors in interest, through their officers, directors and managing agents for the purpose of increasing sales and enhancing its profits, knowingly and deliberately failed to remedy

- 13 -

1   the known defects of Defendants' product, Bextra®, and failed to warn the public, including
2   Plaintiffs, of the serious risk of injury occasioned by the defects inherent in Defendants' product,
3   Bextra®. Defendants and their officers, agents and managers intentionally proceeded with the
4   inadequate testing, and then the manufacturing, sale and marketing of Defendants' product,
5   Bextra®, knowing that persons would be exposed to serious potential danger, in order to advance
6   their own pecuniary interests. Defendants' conduct was wanton and willful, and displayed a
7   conscious disregard for the safety of the public and particularly of Plaintiffs.

8
9                                    **CLAIMS FOR RELIEF**

10                                   **FIRST CLAIM FOR RELIEF:**
                                          **Negligence**

11          66.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
12   if fully set forth herein.

13          67.     Defendants owed Plaintiffs HUFFMAN AND YONNONE a duty to
14   exercise reasonable care when designing, manufacturing, marketing, advertising, distributing, and
15   selling Bextra®. This duty included the duty not to introduce a pharmaceutical drug, such as
16   Bextra®, into the stream of commerce that caused users to suffer from unreasonable, dangerous or
17   untoward adverse side effects.

18          68.     At all relevant times to this action, Defendants owed a duty to properly warn
19   Plaintiffs HUFFMAN AND YONNONE and the Public of the risks, dangers and adverse side
20   effects of their pharmaceutical drug Bextra®.

21          69.     Defendants breached their duties by failing to exercise ordinary care in the
22   preparation, design, research, testing, development, manufacturing, inspection, labeling, marketing,
23   promotion, advertising and selling of Bextra®, including:

24                  a.      failing to use due care in the preparation and development of
25   Bextra® to prevent the aforementioned risk of injuries to individuals when the drugs were
26   ingested;

27                  b.      failing to use due care in the design of Bextra® to prevent the
28   aforementioned risk of injuries to individuals when the drugs were ingested;

                                              - 14 -

1              c.      failing to conduct adequate pre-clinical testing and research to

2  determine the safety of Bextra®;

3              d.      failing to conduct adequate post-marketing surveillance and

4  exposure studies to determine the safety of Bextra®;

5              e.      failing to completely, accurately and in a timely fashion, disclose

6  the results of the pre-marketing testing and post-marketing surveillance and testing to Plaintiffs

7  HUFFMAN AND YONNONE, consumers, the medical community, and the FDA;

8              f.      failing to accompany Bextra® with proper warnings regarding all

9  possible adverse side effects associated with the use of Bextra®;

10             g.      failing to use due care in the manufacture, inspection, and labeling

11  of BEXTRA® to prevent the aforementioned risk of injuries to individuals who used Bextra®;

12             h.      failing to use due care in the promotion of Bextra® to prevent the

13  aforementioned risk of injuries to individuals when the drugs were ingested;

14             i.      failing to use due care in the sale and marketing of Bextra® to

15  prevent the aforementioned risk of injuries to individuals when the drugs were ingested;

16             j.      failing to use due care in the selling of Bextra® to prevent the

17  aforementioned risk of injuries to individuals when the drugs were ingested;

18             k.      failing to provide adequate and accurate training and information to

19  the sales representatives who sold Bextra®;

20             l.      failing to provide adequate and accurate training and information to

21  healthcare providers for the appropriate use of Bextra®; and

22             m.      being otherwise reckless, careless and/or negligent.

23      70.      Despite the fact that Defendants knew or should have known that Bextra®

24  caused unreasonable and dangerous side effects which many users would be unable to remedy by

25  any means, Defendants continued to promote and market Bextra® to consumers, including

26  Plaintiffs HUFFMAN AND YONNONE, when safer and more effective methods of pain relief

27  were available.

28

- 15 -

1       71.     Defendants were, or should have been, had they exercised reasonable care,
2   in possession of evidence demonstrating that Bextra® caused serious side effects. Nevertheless,
3   they continued to market their products by providing false and misleading information with regard
4   to the safety and efficacy of Bextra®.

5       72.     Defendants knew or should have known that consumers such as Plaintiffs
6   HUFFMAN AND YONNONE would foreseeably suffer injury as a result of their failure to
7   exercise ordinary care as described above.

8       73.     As a direct and proximate consequence of Defendants' acts, omissions, and
9   misrepresentations described herein, the Plaintiff and wife suffered loss of support and services
10  and endured mental pain and suffering and loss of consortium of her husband. The losses are
11  permanent and continuing in nature. Plaintiffs HUFFMAN AND YONNONE required healthcare
12  and services incurring direct medical losses and costs including care for hospitalization, physician
13  care, monitoring, treatment, medications, and supplies.

14      74.     Defendants' conduct was committed with knowing, conscious, wanton,
15  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
16  including Plaintiffs HUFFMAN AND YONNONE, thereby entitling Plaintiffs to punitive and
17  exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

18      75.     WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
19  compensatory damages, and exemplary and punitive damages together with interest, the costs of
20  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

21

22

### SECOND CLAIM FOR RELIEF:
#### Strict Liability

23      76.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint
24  as if fully set forth herein and further alleged as follows:

25      77.     At all times relevant to this action, Defendants were suppliers of
26  BEXTRA®, placing the drug into the stream of commerce. BEXTRA® was expected to and did
27  reach Plaintiffs HUFFMAN AND YONNONE without substantial change in the condition in
28  which it was manufactured and sold.

1       78.     BEXTRA® was unsafe for normal or reasonably anticipated use.

2       79.     BEXTRA® was defective in design or formulation because when it left the
3   hands of the manufacturer and/or supplier, it was unreasonably dangerous and more dangerous
4   than an ordinary consumer would expect.   BEXTRA® was also defective and unreasonably
5   dangerous in that the foreseeable risk of injuries from BEXTRA® exceeded the benefits associated
6   with the design and/or formulation of the product.

7       80.     Bextra® is unreasonably dangerous: a) in construction or composition as
8   provided in R.S. 9:2800.55; b) in design as provided in R.S. 9:2800.56; c) because an adequate
9   warning about the product was not provided as required by R.S. 9:2800.57; d) because it does not
10  conform to an express warranty of the manufacturer about the product as provided in R.S.
11  9:2800.58.

12      81.     The characteristics of Bextra® that render it unreasonably dangerous under
13  R.S. 9:2800.55, et seq., existed at the time the product left the control of the manufacturer or
14  resulted from a reasonably anticipated alteration or modification of the product.

15      82.     The BEXTRA® manufactured and supplied by Defendants was also
16  defective due to inadequate warnings, and/or inadequate clinical trials, testing and study, and
17  inadequate reporting regarding the results of the clinical trials, testing and study. Defendants failed
18  to perform adequate testing before exposing Plaintiffs HUFFMAN AND YONNONE to the
19  medication, testing which would have shown that BEXTRA® had the potential to cause serious
20  side effects including strokes like that which affected Plaintiffs HUFFMAN AND YONNONE.

21      83.     The BEXTRA® manufactured and supplied by Defendants was defective
22  due to inadequate post-marketing warnings or instructions because, after Defendants knew or
23  should have known of the risk of injuries from BEXTRA®, they failed to provide adequate
24  warnings to the medical community and the consumers, to whom they were directly marketing and
25  advertising BEXTRA®; and, further, it continued to affirmatively promote BEXTRA® as safe and
26  effective.

27      84.     BEXTRA®  was  manufactured,  distributed,  tested,  sold,  marketed,
28  advertised and promoted defectively by Defendants, and as a direct and proximate cause of

- 17 -

1  Defendants' defective design of BEXTRA®, Plaintiff's HUFFMAN AND YONNONE used
2  BEXTRA® rather than other safer and cheaper NSAIDs. As a result, Plaintiffs HUFFMAN AND
3  YONNONE suffered the personal injuries described above.

4          85.    Information given by Defendants to the medical community and to the
5  consumers concerning the safety and efficacy of BEXTRA®, especially the information contained
6  in the advertising and promotional material, did not accurately reflect the potential side effects of
7  BEXTRA®.

8          86.    Had adequate warnings and instructions been provided, Plaintiffs
9  HUFFMAN AND YONNONE would not have taken BEXTRA® as he did, and would not have
10  been at risk of the harmful side effects described herein.

11          87.    Defendants acted with conscious and deliberate disregard of the foreseeable
12  harm caused by BEXTRA®.

13          88.    Plaintiffs HUFFMAN AND YONNONE could not, through the exercise of
14  reasonable care, have discovered BEXTRA®'s defects or perceived the dangers posed by the drug.

15          89.    As a direct and proximate consequence of Defendants' acts, omissions, and
16  misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
17  and endured mental pain and suffering and loss of consortium of HUFFMAN AND YONNONE.
18  The losses are permanent and continuing in nature. Plaintiffs HUFFMAN AND YONNONE
19  sustained serious cardiovascular injuries. Plaintiffs HUFFMAN AND YONNONE required
20  healthcare and services incurring direct medical losses and costs including care for hospitalization,
21  physician care, monitoring, treatment, medications, and supplies.

22          90.    Defendants' conduct was committed with knowing, conscious, wanton,
23  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
24  including Plaintiff's HUFFMAN AND YONNONE, thereby entitling Plaintiff to punitive and
25  exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

26          91.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
27  compensatory damages, and punitive and exemplary damages together with interest, the costs of
28  suit and attorneys' fees and such other and further relief as this Court deems just and proper.

- 18 -

1
2

**THIRD CLAIM FOR RELIEF:**
**Breach of Express Warranty**

3      92.     Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
4  if fully set forth herein.

5      93.     Defendants expressly represented to Plaintiffs HUFFMAN AND
6  YONNONE and other consumers and the medical community that BEXTRA® was safe and fit for
7  its intended purposes, that it was of merchantable quality, that it did not produce any dangerous
8  side effects, particularly any unwarned-of side effects, and that it was adequately tested.

9      94.     These warranties came in the form of:

10         a.     Defendants' public written and verbal assurances of the safety and
11  efficacy of BEXTRA®;

12         b.     Press releases, interviews and dissemination via the media of
13  promotional information, the sole purpose of which was to create an increased demand for
14  BEXTRA®, which failed to warn of the risk of injuries inherent to the ingestion of BEXTRA®,
15  especially to the long-term ingestion of BEXTRA®;

16         c.     Verbal and written assurances made by Defendants regarding
17  BEXTRA® and downplaying the risk of injuries associated with the drug;

18         d.     False and misleading written information, supplied by Defendants,
19  and published in the Physician's Desk Reference on an annual basis, upon which physicians
20  relied in prescribing BEXTRA® during the period of Plaintiffs HUFFMAN AND YONNONE
21  ingestion of BEXTRA®, and;

22         e.     Advertisements.

23      95.     The documents referred to above were created by and at the direction of
24  Defendants.

25      96.     Defendants knew or had reason to know that BEXTRA® did not conform to
26  these express representations in that BEXTRA® is neither as safe nor as effective as represented,
27  and that BEXTRA® produces serious adverse side effects.

28

1    97.    BEXTRA® did not and does not conform to Defendants' express
2 representations because it is not safe, has numerous and serious side effects, including unwarned-of
3 side effects, and causes severe and permanent injuries.

4    98.    Plaintiffs HUFFMAN AND YONNONE, other consumers, and the medical
5 community relied upon Defendants' express warranties.

6    99.    As a direct and proximate consequence of Defendants' acts, omissions, and
7 misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
8 and endured mental pain and suffering and loss of consortium of her husband. The losses are
9 permanent and continuing in nature. Plaintiffs HUFFMAN AND YONNONE sustained serious
10 cardiovascular injuries. Plaintiffs HUFFMAN AND YONNONE required healthcare and services
11 incurring direct medical losses and costs including care for hospitalization, physician care,
12 monitoring, treatment, medications, and supplies.

13    100.    Defendants' conduct was committed with knowing, conscious, wanton,
14 willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
15 including Plaintiffs HUFFMAN AND YONNONE, thereby entitling Plaintiffs to punitive and
16 exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

17    101.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
18 compensatory damages, and punitive and exemplary damages together with interest, the costs of
19 suit and attorneys' fees and such other and further relief as this Court deems just and proper.

20

21    **FOURTH CLAIM FOR RELIEF:**
**Breach of Implied Warranty**

22    102.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as
23 if fully set forth herein.

24    103.    Defendants manufactured, distributed, advertised, promoted, and sold
25 BEXTRA®.

26    104.    At all relevant times, Defendants knew of the use for which BEXTRA® was
27 intended and impliedly warranted the product to be of merchantable quality and safe and fit for
28 such use.

- 20 -

1    105.    Defendants were aware that consumers, including Plaintiff MELVIN

2    DAVIS would use BEXTRA® for treatment of pain and inflammation and for other purposes.

3    106.    Plaintiffs HUFFMAN AND YONNONE and the medical community

4    reasonably relied upon Defendants' judgment and expertise to only sell them or allow them to

5    prescribe BEXTRA® only if it was indeed of merchantable quality and safe and fit for its intended

6    use. Consumers, including Plaintiffs HUFFMAN AND YONNONE, and the medical community,

7    reasonably relied upon Defendants' implied warranty for BEXTRA®.

8    107.    BEXTRA® reached consumers, including Plaintiffs HUFFMAN AND

9    YONNONE without substantial change in the condition in which it was manufactured and sold by

10   Defendants.

11   108.    Defendants breached their implied warranty to consumers, including

12   Plaintiffs HUFFMAN AND YONNONE; BEXTRA® was not of merchantable quality or safe and

13   fit for its intended use.

14   109.    As a direct and proximate consequence of Defendants' acts, omissions, and

15   misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services

16   and endured mental pain and suffering and loss of consortium of her husband.  The losses are

17   permanent and continuing in nature.  Plaintiffs HUFFMAN AND YONNONE sustained serious

18   cardiovascular injuries.  Plaintiffs HUFFMAN AND YONNONE required healthcare and services

19   incurring direct medical losses and costs including care for hospitalization, physician care,

20   monitoring, treatment, medications, and supplies.

21   110.    Defendants' conduct was committed with knowing, conscious, wanton,

22   willful, and deliberate disregard for the value of human life and the rights and safety of consumers,

23   including Plaintiffs HUFFMAN AND YONNONE, thereby entitling Plaintiffs to punitive and

24   exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

25   111.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks

26   compensatory damages and punitive and exemplary damages together with interest, the costs of

27   suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

28

1

**FIFTH CLAIM FOR RELIEF:**
**Fraudulent Misrepresentation & Concealment**

2

112.    Plaintiffs incorporate by reference all of the paragraphs of this Complaint as

3

if fully set forth herein.

4

113.    Defendants' superior knowledge and expertise, their relationship of trust and

5

confidence with doctors and the public, their specific knowledge regarding the risks and dangers of

6

BEXTRA®, and their intentional dissemination of promotional and marketing information about

7

BEXTRA® for the purpose of maximizing its sales, each gave rise to the affirmative duty to

8

meaningfully disclose and provide all material information about BEXTRA®'s risks and harms to

9

doctors and consumers.

10

114.    Defendants made fraudulent affirmative misrepresentations with respect to

11

BEXTRA® in the following particulars:

12

f.    Defendants    represented    through    their    labeling,    advertising,

13

marketing materials, detail persons, seminar presentations, publications, notice letters, and

14

regulatory submissions that BEXTRA® had been tested and found to be safe and effective for the

15

treatment of pain and inflammation; and

16

g.    Defendants represented that BEXTRA® was safer than other

17

alternative medications.

18

115.    Defendants    made    affirmative    misrepresentations;    and    fraudulently,

19

intentionally and/or recklessly concealed material adverse information regarding the safety and

20

effectiveness of BEXTRA®.

21

116.    Defendants made these misrepresentations and actively concealed adverse

22

information at a time when Defendants knew or had reason to know that BEXTRA® had defects

23

and was unreasonably dangerous and was not what Defendants had represented to the medical

24

community, the FDA and the consuming public, including Plaintiffs HUFFMAN AND

25

YONNONE.

26

117.    Defendants omitted, suppressed and/or concealed material facts concerning

27

the dangers and risk of injuries associated with the use of BEXTRA® including, but not limited to,

28

- 22 -

1  the cardiovascular, cerebrovascular, and other serious health risks. Furthermore, Defendants'
2  purpose was willfully blind to, ignored, downplayed, avoided, and/or otherwise understated the
3  serious nature of the risks associated with the use of BEXTRA® in order to increase its sales.

4          118.    The representations and concealment were undertaken by Defendants with
5  an intent that doctors and patients, including Plaintiffs HUFFMAN AND YONNONE, rely upon
6  them.

7          119.    Defendants' representations and concealments were undertaken with the
8  intent of defrauding and deceiving Plaintiffs HUFFMAN AND YONNONE, other consumers, and
9  the medical community to induce and encourage the sale of BEXTRA®.

10         120.    Defendants' fraudulent representations evinced their callous, reckless,
11 willful, and depraved indifference to the health, safety, and welfare of consumers, including
12 Plaintiffs HUFFMAN AND YONNONE.

13         121.    Plaintiffs HUFFMAN AND YONNONE physician and Plaintiffs
14 HUFFMAN AND YONNONE relied on and were induced by Defendants' misrepresentations,
15 omissions, and/or active concealment of the dangers of BEXTRA® in selecting BEXTRA®
16 treatment.

17         122.    Plaintiffs HUFFMAN AND YONNONE and the treating medical
18 community did not know that the representations were false and were justified in relying upon
19 Defendants' representations.

20         123.    Had Plaintiffs HUFFMAN AND YONNONE been aware of the increased
21 risk of side effects associated with BEXTRA® and the relative efficacy of BEXTRA® compared
22 with other readily available medications, Plaintiffs HUFFMAN AND YONNONE would not have
23 taken BEXTRA® as he did.

24         124.    As a direct and proximate consequence of Defendants' acts, omissions, and
25 misrepresentations described herein, the Plaintiff and his wife suffered loss of support and services
26 and endured mental pain and suffering and loss of consortium of her husband. The losses are
27 permanent and continuing in nature. Plaintiffs HUFFMAN AND YONNONE sustained serious
28 cardiovascular injuries. Plaintiffs HUFFMAN AND YONNONE required healthcare and services

1  incurring direct medical losses and costs including care for hospitalization, physician care,
2  monitoring, treatment, medications, and supplies.

3       125.    Defendants' conduct was committed with knowing, conscious, wanton,
4  willful, and deliberate disregard for the value of human life and the rights and safety of consumers,
5  including Plaintiffs HUFFMAN AND YONNONE, thereby entitling Plaintiff to punitive and
6  exemplary damages so as to punish Defendants and deter them from similar conduct in the future.

7       126.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
8  compensatory damages, and punitive and exemplary damages together with interest, the costs of
9  suit and attorneys' fees, and such other and further relief as this Court deems just and proper.

10
11                            **SIXTH CLAIM FOR RELIEF**
                                **(Unjust Enrichment)**

12       127.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint
13  as if fully set forth herein.

14       128.    At all times relevant to this action, Defendants were the manufacturers,
15  sellers, and/or suppliers of BEXTRA®.

16       129.    Plaintiffs HUFFMAN AND YONNONE paid for BEXTRA® for the
17  purpose of managing his pain safely and effectively.

18       130.    Defendants have accepted payment from Plaintiffs HUFFMAN AND
19  YONNONE for the purchase of BEXTRA®.

20       131.    Plaintiffs HUFFMAN AND YONNONE did not receive the safe and
21  effective pharmaceutical product for which he paid.

22       132.    It is inequitable and unjust for Defendants to retain this money because the
23  Plaintiffs HUFFMAN AND YONNONE did not in fact receive the product Defendant represented
24  BEXTRA® to be.

25       133.    WHEREFORE, Plaintiffs demand judgment against Defendants and seeks
26  equitable relief, the costs of suit and attorneys' fees, and such other and further relief as this Court
27  deems just and proper.

28

1          **PRAYER FOR RELIEF**

2          WHEREFORE, Plaintiffs request the following relief:

3          134.    General damages in excess of the jurisdictional amount of this Court;

4          135.    Consequential damages;

5          136.    Disgorgement of profits;

6          137.    Restitution;

7          138.    Punitive and exemplary damages;

8          139.    Pre-judgment and post-judgment interest as provided by law;

9          140.    Recovery of Plaintiffs HUFFMAN and YONNONE's costs including, but

10    not limited to, discretionary Court costs of these causes, and those costs available under the law, as

11    well as expert fees and attorneys' fees and expenses, and costs of this action; and

12          141.    Such other and further relief as the Court deems just and proper.

1

DEMAND FOR JURY TRIAL

2

Plaintiffs demand a trial by jury on all claims so triable in this action.

3

4

Respectfully submitted,
THE WHITEHEAD LAW FIRM, L.L.C.

5

6

7

By: _____

C. Mark Whitehead, III

8

Bar No. 27682
cmw@whitehead.com

9

Post Office Box 81007
Lafayette, LA 70598

10

337 740-6006 Telephone
337 740-6002  Facsimile

11

12

Attorneys for Plaintiffs

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JS 44 - CAND (Rev. 11/04)

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO.)

| **I.(a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|
| James and Alice Huffman | PFIZER INC., PHARMACIA CORPORATION, and G.D. SEARLE, L.L.C. |

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   Antrim County
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(C)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
The Whitehead Law Firm, L.L.C., PO Box 81007, Lafayette, Louisiana 70598 (337) 740-6006

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☑ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF
(For diversity cases only) AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☑ 4 | ☐ 4 |
| Citizen of Another State | ☑ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ Original Proceeding   ☑ Removed from State Court   ☐ Remanded from Appellate Court   ☐ Reinstated or Reopened   ☐ Transferred from Another district (specify)   ☑ Multidistrict Litigation   ☐ Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☑ 365 Personal Injury Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 RR & Truck | ☐ 820 Copyrights | ☐ 480 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Satellite TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 892 Economic Stabilization Act |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Empl.Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motion to Vacate Sentence Habeas Corpus: | | ☐ 870 Taxes (US Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 530 General | | ☐ 871 IRS - Third Party 26 USC 7609 | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing | ☐ 535 Death Penalty | | | |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 445 Amer w/ disab - Empl | ☐ 555 Prison Condition | | | |
| | ☐ 446 Amer w/ disab - Other | | | | |

## VI. CAUSE OF ACTION (CITE THE US CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. 1332   Prescription Drug Claim

## VII. REQUESTED IN COMPLAINT: ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23   DEMAND $ _____   CHECK YES only if demanded in complaint:
JURY DEMAND: ☑ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY   PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)   ☑ SAN FRANCISCO/OAKLAND   ☐ SAN JOSE

DATE   4-3-08

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Page 2
(Rev. 11/04)

INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44
Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.    (a) Plaintiffs - Defendants. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

II.   Jurisdiction. The basis of jurisdiction is set forth under Rule 8(a). F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.  Residence (citizenship) of Principal Parties. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.   Origin. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

V.    Nature of Suit. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.   Cause of Action. Report the civil statute directly related to the cause of action and give a brief description of the cause.

VII.  Requested in Complaint. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. Related Cases. This section of the JS-44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases. Date and Attorney Signature.

Date and Attorney Signature. Date and sign the civil cover sheet.